Filed 4/11/13  In re M.G. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.G. et al., Persons Coming Under the Juvenile Court Law. | B243897<br>(Los Angeles County<br>Super. Ct. No. CK45503) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>MICHELLE S. et al.,<br><br>        Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Phillip L. Soto, Judge.  Affirmed.

Nancy Rabin Brucker, under appointment by the Court of Appeal, for Defendant and Appellant Michelle S., Mother.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant Pedro G., Father.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

* * * * * *


Appellants Michelle S. (Mother) and Pedro G. (Father) appeal from the dependency court's denial of their petitions for modification (Welfare and Institutions Code section 388)[1] and from the order terminating their parental rights to their son M.G. (now age eight) and their daughter L.G. (now age seven). They contend the court abused its discretion in denying their section 388 petitions. They also contend their parental rights should not have been terminated because they visited regularly and the children would benefit from continuing the family relationship. (§ 366.26, subd. (c)(1)(B)(i).) Mother contends that the court failed to apply the sibling benefit exception to the statutory preference for adoption. (§ 366.26, subd. (c)(1)(B)(v).) We find no error in any of the court's orders and affirm.


**FACTUAL AND PROCEDURAL BACKGROUND**

M.G. and L.G. first came to the attention of DCFS on July 23, 2007. DCFS received a referral alleging general neglect, emotional abuse of the children, and violent altercations between the parents. Rico A.[2] answered the door when the DCFS social workers visited Mother's home. Mother was heard to yell "Tell them to get the fuck out [of] my house." The children were very thin and appeared to have some developmental problems. Mother refused to provide Father's contact information. She stated she had not used methamphetamine since 2002 but tested positive for amphetamine and methamphetamine on July 24, 2007. She refused to cooperate with the social workers

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2] On July 3, 2002, Mother's three children, Juan A. (born 1989), Rico A. (born 1991), and Christopher B. (born 1996), were declared dependents of the juvenile court following sustained allegations of general neglect. In October 2002, the children's maternal aunt and uncle became their legal guardians.

when she realized the children were being taken into protective custody and banged her head against the rear window of the patrol car with enough force to break the glass.

### *August 3, 2007 Section 300 Petition*

DCFS filed a dependency petition on behalf of M.G. and L.G. The petition alleged that Mother had a history of substance abuse and was a current user of amphetamines and methamphetamine; Mother was incapable of providing the children with care; and Father failed to take any action to protect the children when he knew of Mother's drug use (§ 300, subd. (b)(1)). At the detention hearing on August 3, 2007, the juvenile court found Father to be the presumed father for both M.G. and L.G. The court ordered the children detained. Over the next two months, neither parent responded to telephone messages or letters from DCFS. When Father met with DCFS he told them that he and Mother engaged in physical altercations in the presence of the children. Mother acknowledged calling the police to her home but denied any domestic violence issues.

On October 11, 2007, DCFS filed a first amended petition. The allegation that Mother and Father engaged in physical altercations in front of M.G. and L.G., and that the children were exposed to violent confrontations between the parents (§ 300, subd. (b)(2)), was added to the earlier allegation.

### *November 13, 2007 Adjudication Hearing*

Mother testified that she used drugs "a long time ago for a year only, 2001." She blamed her friend who spiked her drink for causing her recent positive drug test. She testified that Father verbally abused her and hit her one time in front of the children. The court sustained both counts of the petition. The children were declared dependents of the court, and Mother and Father were given monitored visitation. The court warned Mother and Father that the services would be terminated if they did not show "significant progress."

### *Interim Reports and Hearings*

The DCFS interim review report dated April 7, 2008, stated that both parents visited the children. Mother completed her parenting classes but Father had not enrolled

3

in any of the court ordered services.  He informed the social worker that he attended parenting classes in the past but it did not help him to get custody of his child from his previous marriage.

At the May 15, 2008 review hearing, the court terminated Father's family reunification services because he had not made significant progress in resolving the problems that led to M.G. and L.G.'s removal.  The court allowed mother to have unmonitored visits on the condition that she remain in compliance with her drug program, and that she not visit the children with Father.  The court explained to Mother that the children could not be returned to her home if she continued to live with Father because he refused to do "anything to help him stop the behavior that brought the case to court."  Mother was also ordered not to have visits with the children at her home.

Mother informed DCFS that 17-year-old Rico was living with her and not attending school.  DCFS made an unannounced visit to Mother's home and discovered Father was present while the children were visiting.  As a result of violating the court's visitation orders the court granted DCFS's section 388 petition and ordered Mother's visits changed from unmonitored to monitored.

Mother and Father continued to visit the children.  Mother missed two drug testing appointments on October 29, 2008, and December 4, 2008, and had minimal contact with DCFS.  Mother continued to deny that Father resided with her, even though he was at her home during subsequent unannounced visits by DCFS in November 2008, and February 2009.

### March 24, 2009 18-Month Permanency Review Hearing

Mother testified that she had no relationship with Father and he did not enter the house.  The court returned the children to Mother's custody over DCFS's objections, and ordered DCFS to provide Mother with family maintenance services.

### Interim Report and Hearing (September 22, 2009)

The DCFS status review report dated September 22, 2009, noted that the program coordinator at the Failure to Thrive Clinic at Harbor/UCLA stated that both children were underweight, and had possible speech and developmental delays.  It was also determined

4

that the children were in need of mental health services. Mother was advised to make appointments with the appropriate specialists. She stated that she wanted "DCFS out of [her] life," she did not trust the social workers and was "tired of having [them] come into [her] house."

Mother refused to acknowledge that the children needed help even though they continued to present signs and symptoms of failure to thrive, speech deficiency and socialization difficulties. She stated that her DCFS case would soon be closed and she would not have to come to the nutrition clinic any longer. Mother did not show up for scheduled school appointments to discuss M.G.'s behavioral problems which included his refusal to participate with others, hiding under tables, and running away. The regional center assessment worker initially diagnosed the problem as "selective mutism" a condition in which a child who can speak well, stops speaking, usually in school or social settings. The assessor stated that M.G. was either "very scared or something very traumatic happened to him in the past or recently." L.G. was receiving speech therapy. She was aggressive and antagonistic and kicked and hit older children in the playground at kindergarten.

Mother resisted efforts to enhance her parenting skills and to access alternative food and recreational sources and stated "I want DCFS out of my life and I am tired of having to go places for my children when they are normal kids. Nurses ask me questions about my past, the clinic people keep saying that [L.G.] is thin or not speaking. . . . They ask too much and I am tired. I don't trust those people. I want everybody out."

Mother failed to disclose that L.G. had been taken to the emergency room on July 1, 2010, and subsequently hospitalized for four days for a high fever, cough and swollen throat. L.G.'s infection had been ongoing because the John Tracy Clinic was unable to carry out a hearing assessment for the children in December 2009, and again in June 2010, because L.G. had an ear infection and M.G. had excessive wax. After L.G. was discharged from the hospital Mother did not follow the instructions she was given for L.G.'s follow-up care. She waited five days instead of two days to see the pediatrician and failed to make an appointment with an ear, nose and throat specialist. The court

5

ordered a psychological evaluation pursuant to Evidence Code section 730, and found that continued jurisdiction of the children was necessary.

### Section 342 Petition[3]

On October 13, 2010, DCFS filed a section 342 petition on the children's behalf, alleging Mother had mental and emotional problems and had failed to seek medical treatment for the children (§ 300, subds. (b) and (j)).

Mother initially refused to cooperate with the court order that she undergo psychological evaluation. She told the social worker she was sick and tired and stated, "I'll take my kids and go somewhere that's better than here and no one can bother me. Even if you take my children away, I will kidnap them."

In mid-September, more than two months after receiving the referral from Children's Hospital, Mother had not made an appointment for L.G. with an ear, nose and throat specialist.

On August 23, 2010, Lauren Reba-Harrelson, Ph.D., a forensic psychologist, evaluated Mother. She opined that Mother "display[ed] features of borderline personality disorder, including mood instability, difficulty controlling anger, unstable interpersonal relationships, and impulsive, maladaptive behavior." Dr. Reba-Harrelson recommended that Mother's custody of the children be terminated because Mother's poor insight and judgment, history of drug use and domestic violence, and resistance to DCFS services, posed a significant threat to her children's well-being and safety.

### October 13, 2010 Detention Hearing

The court found a prima facie case for detaining M.G. and L.G. and that the children were minors described by section 300, subdivisions (b) and (j). Custody of the children was vested with DCFS and the children were placed in foster care. The court ordered monitored visitation for Mother. The court was informed that Father's

---

[3] Section 342 permits DCFS to file a subsequent dependency petition that alleges "new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300 . . . ."

6

whereabouts were unknown,[4] and he would have monitored visitation when he contacted DCFS or the court.

### *Interim Reports*

Mother interviewed with DCFS for the jurisdiction/disposition report dated November 19, 2010. She denied all the allegations in the petition. She discussed being a victim of physical and sexual abuse as a child, and the victim of physical abuse by the fathers of her first three children. Father also hit her, but not as much as the other men. She described Father as "stubborn" and "pig-headed."

Father was interviewed on November 2, 2010. He stated that Mother had anger issues and yelled at the children, but he had never seen her hit them. Father told DCFS that he had a separate open case involving another son. The mother of that child had filed a restraining order against Father because he had taken the child without her consent. Father stated that domestic violence counseling classes did not help and he did not have the time or the money to complete the classes.

In its December 20, 2010, interim review report, DCFS reported that the children were continuing to receive medical and mental health services since their removal in October 2010. M.G.'s communication skills had improved and the social worker was able to understand 75 percent of his words and sentences. L.G. appeared to be more talkative than her brother but the social worker could only understand approximately 35 percent of what she said.

DCFS recommended the court terminate family reunification services for Mother and requested a court-appointed special advocate (CASA)[5] representative for the children because they had numerous educational needs.

---

[4] At a hearing on March 23, 2010, the court relieved Father's counsel. Father had no contact with his children, with DCFS, or with his counsel.

[5] "CASA" stands for Court-Appointed Special Advocate, and also refers to a Court Designated Child Advocate. (§ 101, subd. (c).) A CASA representative is charged with providing "independent, factual information to the court regarding the cases to which he

*December 20, 2010 Section 342 Adjudication Hearing*

Mother testified at the contested adjudication hearing that she took L.G. to the doctor "right away" when she complained of an earache. Mother also denied making any statements about taking her children away or kidnapping them.

Rico testified that he accompanied Mother to all of L.G.'s doctors' appointments. He testified that Mother treated L.G.'s ear infection problem and followed through with seeing the ear, nose and throat specialist. He lived with Mother for approximately three years and did not have a job or go to school. On cross-examination, Rico denied he relied on Mother for support and stated his income came from winning online games on his computer.

The court sustained the petition and found that Mother had been diagnosed with borderline personality disorder (§ 300, subd. (b)(1)), and did not follow through correctly with medical appointments for L.G.'s ear infection (§ 300, subds. (b)(2) and (j)(1)). A disposition hearing was set for January 18, 2011.

On January 10, 2011, Father made an unannounced visit to DCFS and asked to visit with M.G. and L.G. He also requested referrals for parenting and individual counseling. Father wanted to know when the children were returning home. He did not want to continue paying $935 for rent for the house when his children were not living there. He stated that neither Mother nor Rico, who lived at the house and stayed in his room all day, were employed.

Also on January 10, 2011, DCFS reported that L.G. had exhibited severe behavioral problems at her caregiver's home. L.G. broke her medication bottle and had missed several doses of her medication. L.G. was placed in a new foster home with Mr. and Mrs. N., who were both teachers at L.G.'s school.

On January 12, 2011, Mr. N. notified DCFS that L.G. needed constant attention and direction and threw tantrums at their home when she did not get her own way.

---

or she is appointed," and representing "the best interests of the children involved," and consider "the best interests of the family." (§ 102, subds. (c)(1), (c)(2).)

Individualized education programs (IEP's) had not been prepared for the children because Mother as the holder of the educational right had not provided the necessary signature.

On January 18, 2011, the court limited the parents' educational rights and appointed an educational surrogate for L.G. On February 23, 2011, the court made a similar order pertaining to M.G.

### *Father's First Section 388 Petition (April 5, 2011)*

On April 5, 2011, Father filed a section 388 petition asking the court to release the children to his custody, or in the alternative, order family reunification services for him. Father claimed to have completed a 52-week domestic violence program, a parenting class, and was undergoing individual counseling.

On May 17, 2011, DCFS filed a response to Father's petition. The domestic violence program Father claimed to have completed was from approximately five years earlier and Father did not have any documentation for it. He was enrolled in parenting classes but had not completed a program. The report also noted that Father and Mother visited the children together and sometimes got into arguments in the children's presence, causing both children to cry. L.G.'s behavior at school was significantly worse on the days following visits with her parents. Her caregiver reported that she cried for long periods of time after the visits. When M.G. returned from the visits he acted in a negative and defiant manner. Father asked to have his visits separate from Mother.

In the May 17, 2011 report prepared for the permanency planning hearing, DCFS reported that M.G. was enrolled in the first grade but was performing far below grade levels in English and math. L.G. was referred for special education due to speech and language impairment.

On May 17, 2011, at the combined sections 366.26 and 388 hearing, Father's counsel withdrew Father's section 388 petition. The court continued the section 366.26 hearing to September 13, 2011, based on DCFS's representation that they were trying to find an adoptive home for both children.

In the status review report dated July 19, 2011, DCFS reported that M.G. was diagnosed with post-traumatic stress disorder and required court approval to begin treatment with medication. L.G. was receiving psychotropic medication for her mood disorder. The children continued to live in separate foster homes. L.G.'s behavior improved since placement with Mr. and Mrs. N. M.G. continued to be defiant with his caregivers and wanted to live with L.G. Mother was crying when she called DCFS on April 13, 2011, to report that she was having domestic violence issues with Father. She stated she was participating in domestic violence counseling but could not provide DCFS with documentation. Father made numerous visits to DCFS offices without prior notice. He told them he was enrolled in parenting classes and participating in individual counseling. He referred to the domestic violence program he claimed to have completed five years earlier but could not provide any documentation because he claimed to have moved out of the home on April 13, 2011, during the incident of domestic violence.

Both parents continued to visit the children together despite Mother and Father's strained relationship. The children appeared to be in control during the visits and both parents lacked the necessary parenting skills to be assertive and set boundaries. In April 2011, Father requested separate visits. Mother contacted DCFS and asked that Father undergo a psychological evaluation and stated she did not want the children to reunify with Father because of his violent behavior. Separate visitation schedules were prepared and sent to the parents. In May 2011, the parents informed DCFS that they wanted to visit the children together, and did so over the objections of the caregivers. The visitation monitor reported that although both parents appeared to love the children, they lacked parenting skills. The children were usually in control and ignored the parents.

At the September 13, 2011 hearing, the court appointed Lynn James as the CASA representative.

### Father's Second Section 388 Petition (November 8, 2011)

On November 8, 2011, Father filed a section 388 petition asking the court to order family reunification services for him, or in the alternative, increase his visitation with the children. Father stated that he and Mother now visited the children separately and all

10

their issues had been resolved. He was committed to reunifying with his children and attached a certificate of completion for 20 parenting classes in May 2011, and a letter that certified he had completed a 52-week domestic violence program in 2005.

**Interim Reports (*January 13, 2012 and January 17, 2012*)**

In a last minute information for the court, filed January 13, 2012, DCFS reported that it was searching for an adoptive family for both children. DCFS was assessing Mr. and Mrs. N.'s home for that purpose because Mrs. N. was now interested in adopting both M.G. and L.G.

In the status review report dated January 17, 2012, DCFS reported that both children's behavior had improved and M.G. wanted to live with L.G. Mother filed a restraining order against Father, and they continued to visit the children separately. Father wanted to take the children to San Jose where he had some family support, or have them adopted by his sister Veronica G., who lived in Arizona.

DCFS's response to Father's section 388 petition listed their concerns: Father continued to engage in domestic violence with Mother despite having completed a program in 2005, he was not being truthful about his living arrangements, he had a job which required him to leave home on short notice and DCFS was concerned that he would have minimal time to make adequate childcare arrangements, he lacked a support system to help assist him with the children, and had failed to comply with court orders in the past and avail himself of family reunification services, and he may rely on Mother to take care of the children.

On January 17, 2012, Lynn James filed a report with the court. Ms. James visited the children in their foster homes and indicated that both children were friendly but had problems verbally expressing themselves. Ms. James also monitored visits between the children and their parents and noticed that both parents had difficulty engaging with the children. She observed that Mother handed M.G. a cell phone to play with instead of encouraging him to participate in activities with other children that were present. During the same visit, Mother was unable to work with L.G. on a project, and left L.G. to work alone. Father exerted no control over M.G. who bounced a ball off furniture, walls, and

11

the ceiling, in Father's presence and continued to do so until he was reprimanded by the CASA representative. Ms. James opined that both children needed continued educational, psychological, and speech assistance. She recommended that M.G. be placed with his sister at the home of Mr. and Mrs. N. and DCFS continue to assess Mr. and Mrs. N. for adoption of M.G. and L.G.

### *January 17, 2012 Hearing on Father's Second Section 388 Petition*

The court denied the petition stating it was not a difficult case to judge because Father "clearly" had not met his burden. Father had not shown a change of circumstance or that modification was in the children's best interest.

In a report filed with the court on April 17, 2012, Lynn James reported that L.G. was more outgoing and there had been a "dramatic change" in her ability to communicate. M.G. was also more vocal. Ms. James received positive reports about the children's progress at school and noted the support they received in the home of Mr. and Mrs. N. She opined that moving the children to live in Arizona with an extended family member they did not know, would impede the forward progress they had made in their home and school life. Both M.G. and L.G. responded "Yes" when asked if they liked living with Mr. and Mrs. N.

Mother filed a section 388 petition on April 16, 2012, asking the court to grant her family reunification services, or in the alternative, order DCFS to place the children with their adult sibling Rico. On April 17, 2012, the court summarily denied the petition because it did not state new evidence or a change of circumstances.

In an interim review report filed July 17, 2012, DCFS reported that it was not in the best interest of the children to be placed with Rico because they suspected that Mother resided with Rico. DCFS did not approve of placing the children with Veronica G. because she had not made any efforts to contact DCFS to inquire about the children's status and Father stated he would move to Arizona if the children were placed with his sister.

In a report dated July 17, 2012, Lynn James stated that the children were thriving in the home of Mr. and Mrs. N. and it would be an excellent adoptive home for them.

She met with Rico and was concerned because he did not have "the maturity to take on the responsibility of raising two children requiring special support systems."  Ms. James had not met with Veronica G. in Arizona but noted that neither Veronica G. nor her family had spent any time with M.G. or L.G.  It was her opinion that if M.G. and L.G. were forced to change homes, schools, and states, it would set both children back at a very important educational and personal growth time of their lives.

In a last minute information for the court, filed August 24, 2012, DCFS reported that on July 25, 2012, a social worker made an unannounced visit to Rico's home.  The social worker could see shadows moving inside the house through the closed screen door and heard a male voice say "Mom."  Rico stated that Mother did not reside with him.  He appeared nervous and his hands were shaking.

DCFS strongly recommended that parental rights for Father and Mother be terminated as it was detrimental for the children to return to the home of either parent.  Mr. and Mrs. N. were eager to adopt M.G. and L.G. and the children had developed strong bonds with them.  Both children told the social workers that they wanted to stay with Mr. and Mrs. N.

### *Mother and Father's Section 388 Petitions* (*August 13, 2012*)

Father filed a petition stating that he had completed 25 domestic violence classes, 20 parenting classes, and participated in individual counseling.  He had also visited the children as much as possible.  He asked the court to order family reunification services for him and stated it would be in the children's best interest because he and his children had "bonded" and had a "loving relationship."

Mother's petition sought family reunification services, or in the alternative, placement of the children with Rico.  She stated that she completed parenting classes and continued to participate in individual counseling.  She stated that any further estrangement between her and her children would negatively impact the close nature of the bond between her and her children.

*August 28, 2012 Combined Sections 366.26 and 388 Hearing*

The court first heard testimony regarding Mother's section 388 petition. Rico testified that Mother was not at his home when the social worker visited on July 25. He testified that he could take care of the children and that his 22-year-old brother could babysit them while he was at work. L.G. testified that she liked Rico but when asked if she would like to live with him responded, "No." M.G. testified that if given a choice, he would choose to live with Rico, because Rico was his brother and M.G. liked him.

Mother's counsel argued that Mother made efforts to address her past problems and should be given family reunification services. If the court was not inclined to do so, then the children should be placed with Rico. Counsel for DCFS argued that despite having received years of counseling Mother had not advanced from the stage of "marginal care" of the children, and characterized the request to place the children with Rico as a "last-ditch effort to try to salvage the situation." Children's counsel noted that both children were thriving in their current placement and it would not be in their best interest to change placement. Lynn James also testified that the children were thriving in their current placement, and that while Rico had great intentions, he was a young man who did not understand the requirements of two special needs children.

The court noted the long history of the case including the fact that in 2009 the children were returned to Mother's custody over DCFS's objection. Mother demonstrated that she was not able to take care of them. No family members had come forward until after Mother's family reunification services were terminated, and the court stated that the preference now was for permanency over family placement. The court noted the reports that showed the children were doing well in their current placement and the recommendation of the CASA representative. The court credited Mother for making efforts to change but stated, "It's too late now to make any changes that are not going to be too upsetting for the children in the long run and that's what I've got to look at." The court denied Mother's section 388 petition.

The court then heard argument on Father's section 388 petition. Father's counsel argued that Father first appeared in the case on January 18, 2011, and was not given

14

reunification services because Mother's services had run out. Since then Father had completed parenting classes, participated in individual counseling, and enrolled in domestic violence classes. He further argued that DCFS's objections and concerns about Father were speculative. Counsel for DCFS argued that Father was aware of the case since August 3, 2007, when the first dependency petition was filed. Father avoided coming to court and avoided contact with DCFS. Children's counsel noted that Father was offered family reunification services in 2007 and failed to take advantage of them. He had ample opportunity over the years to get his children back and did not do so. In the meantime, the children had grown and were doing well in their current placement.

The court commended Father for his efforts but noted that he should have done more when the case began in 2007 and the children were much younger. The court stated the children needed to have a permanent home and people they could rely on to look out for their best interest. The court denied Father's section 388 petition finding that it was not in the children's best interest to order reunification services for him.

Turning to the section 366.26 portion of the hearing, the court heard testimony from M.G., L.G., and Mother. M.G. testified that he played with Father and Mother during visits and would be sad if he could not see them again. L.G. testified that she would be sad if she could not see her parents and would like to live with Mother. Mother testified she visited M.G. and L.G. every week and the children were always happy when the visits began and sad when the visits ended.

Mother's counsel argued there was a bond between Mother and the children and severance of that bond would be detrimental to them. Children's counsel asked the court to terminate parental rights because there was no applicable exception to adoption. He pointed out that parents were having separate monitored visits and they alternated each week. Parents had not reached the point of unmonitored visits, much less overnight visits that might provide the consistency and quality of contact to establish a bond that would overcome the children being adoptable.

The court found no exception to adoption applied to the case. The court stated that the parents had not met their burden of showing how M.G. and L.G. would benefit from

15

continuing the relationship with Father and Mother. The parents had "dragged their feet all the way along" and did not do what was necessary to make sure the children were raised in a healthy stable home. The court concluded, "The parents are really not doing anything benefitting to these children by . . . not letting the children be adopted into a family that's ready, willing and able to adopt them." The court terminated parental rights, freed the children from parental custody and control, and identified adoption as the permanent plan.

Mother and Father both filed appeals, challenging the court's order terminating their parental rights, and the court's denial of their respective section 388 petitions.

## DISCUSSION

### I. Contentions

Mother and Father contend the court abused its discretion in denying their petitions for modification pursuant to section 388. Mother and Father also contend that the beneficial parental relationship exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i), applies in this case, and it was error for the juvenile court to terminate their parental rights. They argue that termination of parental rights would be detrimental because they have maintained regular visitation and contact with the children. Mother also contends that parental rights should not be terminated because it would substantially interfere with the children's sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).)

### II. Standard of Review

We review a juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re Aaron R.* (2005) 130 Cal.App.4th 697, 705.) Under this standard, a reviewing court must uphold the trial court's decision unless it determines from the record that the decision exceeded the bounds of reason. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685–686.)

16

When reviewing an order terminating parental rights, we determine if substantial evidence supports the conclusions of the dependency court. All conflicts are resolved in favor of the prevailing party and all legitimate inferences are drawn to uphold the lower court's ruling. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) We cannot reweigh the evidence or substitute our judgment for that of the trial court. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)

### III.    Relevant Law

#### *Section 388*

Section 388 allows the juvenile court to modify an order if a party establishes, by a preponderance of the evidence, that changed circumstances or new evidence exists and the proposed change would promote the child's best interest. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) After reunification services have been terminated, the focus is on the child's need for permanency and stability; the parent's interest in the custody and companionship of the child is not paramount. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) This is a difficult burden to meet in many cases, but particularly so when, as here, reunification services have been terminated. (*Ibid.*)

A "'changed circumstance'" is one "'that requires changing the [court's] order'" because the problems that initially led to the dependency of the child have been resolved. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 592.) A mere showing of "changing" circumstances is not enough. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.]" (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189, citing *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450–1451.)

#### *Section 366.26, Subdivision (c)(1)(B)(i)*

"'After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a "placement that is stable, permanent, and that allows the

caretaker to make a full emotional commitment to the child. [Citation.]"'"" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 935.) Under section 366.26, subdivision (c)(1), parental rights may be terminated if there is clear and convincing evidence of adoptability, which is the preferred plan. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) An exception to adoption exists where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "A beneficial relationship is one that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.]" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206.)

The parents must show why the statutory exception applies, and that termination would be detrimental to the child. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) They carry the burden of proving that the children would be "greatly" harmed by termination of parental rights, and that they hold a "parental" role with the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853–854; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466–468.)

### Section 366.26, Subdivision (c)(1)(B)(v)

Under section 366.26, subdivision (c)(1)(B)(v), the juvenile court is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, "including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption. [Citation.]" (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952.)

To show a substantial interference with a sibling relationship, the person opposing the termination of parental rights "must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 952, fn. omitted.) To determine the significance of the sibling relationship, the juvenile court considers the factors set forth in section 366.26, subdivision (c)(1)(B)(v). (*In re L. Y. L., supra,* at p. 952.)

## IV.    Mother's Appeal

### A.    *There Was No Abuse of Discretion When the Juvenile Court Denied Mother's Section 388 Petition*

First, Mother sought additional family reunification services. But while Mother may have shown a change in circumstances she failed to show how the proposed modification would be in the children's best interest as required by the statute. (§ 388.) M.G. and L.G. had numerous special needs and developmental delays. They were receiving the care they needed and were thriving in the home of Mr. and Mrs. N. Both DCFS and the CASA representative recommended the children remain placed with Mr. and Mrs. N.

Mother's ability to take care of M.G. and L.G. is undermined by her unfavorable prior history with DCFS. Mother's relationship with DCFS was characterized by her refusal to recognize that DCFS was acting in the children's best interest. She repeatedly told DCFS that she did not want their help, wanted the case closed because the children did not have any problems, and threatened to kidnap the children if DCFS detained them. M.G. and L.G. were first detained in 2007 and Mother received services for five years but was unable to reunify with them. In 2009, the juvenile court returned the children to Mother. During the short period of time Mother was responsible for M.G. and L.G. she clearly demonstrated that she was unable to care for them. She did not seem to

19

understand the significance of the fact that the children were not gaining weight and chose to ignore the recommendations offered by the nutrition consultant. Mother also failed to obtain medical treatment for L.G.'s ongoing infection resulting in L.G.'s hospitalization. When L.G. was discharged Mother failed to make appointments for follow-up care. Mother was noncooperative with the children's schools and delayed their development because she was the holder of their educational rights. Eventually the court appointed a surrogate so that the children could receive the services they needed.

Mother's ability to protect the children is questionable because her relationship with Father was erratic and unpredictable. Mother repeatedly lied to DCFS about her relationship and living arrangements with Father. She allowed him to visit the children at her home in violation of the court order. She argued with DCFS and defended Father's right to see the children. Mother repeatedly told DCFS that Father was violent and she did not want him to have custody of the children. Even though she obtained a restraining order against Father she continued to accompany him to visit the children. At Father's request DCFS made arrangements that Mother and Father visit the children separately. Shortly thereafter, despite Mrs. N.'s objections, Mother and Father visited the children together.

More alarming than Mother's apparent inability to detect problems with her children was the fact that she continued to deny the children were having any problems and refused to take advantage of the services offered to her. In this case, where reunification services had been terminated, Mother did not come close to meeting the burden required. (*In re Angel B., supra,* 97 Cal.App.4th at p. 464.)

Similarly, removing the children from the home of Mr. and Mrs. N. and placing them with their older sibling Rico, as Mother requested, would not be in the children's best interest. M.G. and L.G. required special advocates to ensure they received necessary medical, dental, psychological, educational, and developmental services. Both DCFS and the CASA representative recommended the children remain placed with Mr. and Mrs. N. for that reason. In response to the court's question asking why he had not notified DCFS that he was willing to take care of the children before Mother's reunification services

20

were terminated, Rico testified that when the children were detained in 2010 he did not have a job, and was not sure he could take care of them at the time. DCFS argued that Rico's late offer to be the children's caretaker was an effort to keep the children where Mother could have access to them because when they made unannounced visits to Rico's home they suspected Mother was present. Whether DCFS's characterization of Rico's intent was accurate or not, the overriding concern is what best benefits M.G. and L.G. There was no evidence presented that Rico had the ability to provide M.G. and L.G. with the necessary care they required and the children would not benefit from upsetting the stable relationship they developed with Mr. and Mrs. N.

Considering the children's best interest in light of the entire factual and procedural history of the case (*In re Justice P., supra,* 123 Cal.App.4th at p. 189), the dependency court did not abuse its discretion in denying Mother's petition for a modification.

### B.  *Termination of Mother's Parental Rights*

#### 1.  **The "Benefit to the Child" Exception**

Mother must show both prongs of the exception: regular visitation and a benefit to the children if the relationship were continued. (§ 366.26, subd. (c)(1)(B)(i).) As to the first prong, Mother's visitation has been consistent. But the children's relationship with Mother is not so substantial that they would be greatly harmed if it were severed, and we find that the trial court's decision to terminate parental rights was supported by substantial evidence.

The decision to terminate parental rights in this dependency case was not one hastily made. The case lasted for five years before parental rights were terminated. From the outset, the juvenile court stressed the importance of enrolling and participating in the services offered by DCFS and warned Mother that the services would be terminated if she did not show significant progress. Despite having lost custody of her three older children in 2002 because she used methamphetamines, and testing positive in 2007 for amphetamines and methamphetamines when M.G. and L.G. were first detained, Mother emphatically denied drug abuse. Mother and Father have a history of domestic violence.

21

As late as November 2011, more than four years after the children were first detained, Mother sought a restraining order against Father.

At times Mother was granted unmonitored visitation with the children during the five years of receiving family reunification services. But as a result of Mother's defiant and uncooperative attitude and her violation of court orders she was unable to have continuous unmonitored, weekend or extended visits, let alone custody of the children. A showing that a child would be greatly harmed by termination of parental rights is difficult to make when, as here, "the parents have . . . [not] advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) A true parental relationship would not require a third party to monitor parent-child visits.

Mother argues that she has consistently visited the children, and interacted "positively throughout the visitations." But even frequent and loving contact between parent and child is not sufficient to establish the requisite benefit to the child if Mother does not occupy a parental role and is unable to take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108–1109.) While the children are bonding with their prospective adoptive parents, Mother has not progressed to the point where she can have unmonitored or overnight visits, even if the visits are enjoyable for Mother and the children. A relationship that is "pleasant" is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W., supra,* 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

The DCFS and CASA representative reports showed that the children interacted minimally with their parents. Mother lacked the parenting skills necessary to be assertive and discipline the children and the children appeared to be in control. Even though both children had developmental, speech and socialization issues, Mother did not encourage them to interact with other children and left them to play alone.

Mother emphasizes the significance of the children's testimony that they wanted to live with her. But apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.) M.G. was three years old and L.G. was two years old when they were detained. Both of the children showed signs of neglect and were diagnosed with numerous developmental disabilities when they were removed from Mother's custody. The time the children spent with Mother could hardly be described as positive. By way of contrast, the children were thriving with Mr. and Mrs. N. Mother did not carry her burden of showing that the children would be greatly harmed by the termination of her parental rights, or that the benefits of continuing their relationship outweighed the benefits of a stable, permanent home. Where, as here, the children are likely to be adopted, the court must choose adoption over a guardianship to give them "the most permanent and secure alternative that can be afforded them." (*In re Beatrice M., supra,* 29 Cal.App.4th at p. 1419.)

### 2. The "Sibling Relationship" Exception

On appeal, Mother contends the sibling relationship exception applies in this case. She argues that parental rights should not be terminated if a "substantial interference with a child's sibling relationship" would be detrimental to the children. (§ 366.26, subd. (c)(1)(B)(v).) Mother did not raise this argument below. DCFS asserts that Mother has therefore waived the argument on appeal. Mother argues that raising the sibling exception would have been futile because the court had rejected placement of the children with Rico when denying Mother's section 388 petition.

Facing a similar situation, the Court of Appeal in *In re Erik P.* (2002) 104 Cal.App.4th 395 stated: "The application of any of the exceptions enumerated in section 366.26, subdivision (c)(1) depends entirely on a detailed analysis of the relevant facts by the juvenile court. [Citations.] If a parent fails to raise one of the exceptions at

the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial court's determination is supported by substantial evidence. [Citation.] Allowing the [parent] to raise the exception for the first time on appeal would be inconsistent with this court's role of reviewing orders terminating parental rights for the sufficiency of the evidence. Therefore, the [parent] has waived [the] right to raise the exception. [Citation.]" (*Id.* at p. 403.)

Mother did not raise the sibling relationship exception during the section 366.26 portion of the hearing below. Both Mother and Father's respective counsel argued that parental rights should not be terminated based only on the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)), and this was the only argument addressed by the court. Accordingly, Mother has forfeited the argument on appeal.

Even if the testimony from Rico and the children during the combined hearing overcomes waiver and forfeiture, this argument fails on its merits. The sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "'compelling reason'" for concluding that the termination of parental rights would be "'detrimental'" to the child due to "'substantial interference'" with a sibling relationship. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813, quoting § 366.26, subd. (c)(1).)

Mother failed to present any evidence at the combined hearing that the need for sibling bonds would outweigh the benefits of adoption. (§ 366.26, subd. (c)(1)(B)(v); see *In re Erik P., supra,* 104 Cal.App.4th at p. 403.) In other words, Mother failed to satisfy her heavy burden of proof for the exception to apply.

## V.    Father's Appeal

### A.    *There Was No Abuse of Discretion When the Juvenile Court Denied Father's Section 388 Petition*

Father contends he made the required showing of (1) changed circumstances, and (2) that the proposed modification would be in the children's best interest.  (§ 388.)  DCFS argues that Father's participation in domestic violence counseling during the months prior to the combined section 388 and section 366.26 hearing in August 2012, cannot be considered a change in circumstances.

In Father's section 388 petition filed on August 13, 2012, which is relevant to this appeal, he stated that he completed 25 domestic violence classes.  He attached a progress report from the Neighborhood Family Center which showed that he enrolled in the 52-week program on February 7, 2012.  Relying in part on this evidence, Father argues in his opening brief that his completion of "eight months of individual counseling for domestic violence/anger management, and six months of a domestic violence program showed there had been a change of circumstances."

DCFS argues that Father waited too late, i.e., until 2012, to enroll in domestic violence counseling.  In his reply brief, Father argues he "did not wait until 2012 to enroll in domestic violence counseling.  Father successfully completed about nine months of individual counseling for domestic violence in 2011.  He then started more domestic violence counseling in 2012."  Father directs us to a progress report dated September 12, 2011, from Drew Child Development Corporation that showed Father was enrolled in "Individual Counseling/Anger Management" classes that began on January 11, 2011.  An earlier progress report dated July 18, 2011, described the services offered to Father as "Domestic Violence/Anger Management."  The progress reports state that Father's attendance was "good" but do not state whether Father completed the required number of

25

sessions. Furthermore, the reports do not describe what aspects of domestic violence were addressed in the counseling sessions.[6]

In our view, regardless of whether Father made the sufficient showing of changed circumstances, the proposed modification was not in M.G. and L.G.'s best interest. The factors for evaluating a section 388 petition are set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532: the seriousness of the problem leading to the dependency; the strength of relative bonds between the child and both the parent and the caretaker; and the degree to which the problem may be/has been easily removed.

Domestic violence was one of the problems that initially led to M.G. and L.G.'s detention and Father's relationship with Mother was characterized by incidents of domestic violence. Mother initially denied it was a problem and ironically it was Father who first alerted DCFS in October 2007 to its existence, resulting in an amended dependency petition. Mother later testified in court that Father hit her in front of the children but declined to give further details. Father refused to undergo court ordered domestic violence counseling and his family reunification services were terminated in May 2008. Mother did not want the children to reunify with Father because of his violent behavior. Father did not undergo domestic violence counseling when M.G. and L.G. were first detained. He did not do so when the children were returned to Mother's custody in March 2009, nor did he do so when the children were detained for a second time in October 2010. He told DCFS that domestic violence counseling classes were a waste of his time and money. Mother and Father argued during visits causing M.G. and L.G. to cry. Mother was seeking a restraining order against Father in November 2011, more than four years after the children were first detained.

---

[6]    When Father filed his second section 388 petition in November 2011 he did not direct the court's attention to the progress reports from Drew Child Development Corporation. Instead, to show compliance with the court's order regarding domestic violence counseling, Father attached a letter dated January 10, 2005, that showed completion of a 52-week domestic violence program.

Father argues that the issue of domestic violence is resolved and contends there was no evidence other than Mother's allegation that an incident occurred on April 13, 2011. That contention is contradicted by Father's own admission. On May 17, 2011, Father withdrew his first section 388 petition because the domestic violence program Father claimed to have completed was five years old. Father explained to DCFS that he could not provide the necessary documentation because he moved out of the home on *April 13, 2011*, because of domestic violence.

The evidence described above pertained to the first and third *Kimberly F.* factors—the seriousness of the problems leading to the dependency, and the degree to which those problems have been ameliorated. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.) In contrast to Father's arguments, the evidence showed that the problems that led to the dependency have not been fully ameliorated, and that the children remained at risk from Father's behavior.

The last factor under *Kimberly F.* is the strength of the relative bonds between the dependent children and both the parents and the caretakers. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.) Father was either absent from the children's lives for large periods of time during the five-year duration of this case, or when he was present he was unable and unwilling to recognize and remedy the health, educational, and psychological deficits his children encountered. Nothing in Father's current monitored visits with M.G. and L.G. suggested that he stood in a parental role with them. The existence of an emotional bond with the children by itself, is insufficient. (*In re Andrea R., supra,* 75 Cal.App.4th at p. 1108.) On the other hand, the children were doing well and had experienced no difficulties adjusting to their placement with Mr. and Mrs. N. or being apart from Father.

The court properly determined it was not in the children's best interest to grant Father family reunification services.

### B.      *Termination of Father's Parental Rights*

Father contends the evidence demonstrates M.G. and L.G. would benefit from continued contact with him given they had positive visits and he felt they shared a strong

27

bond and a significant relationship. Father asserts the children enjoyed his visits and looked forward to seeing him. But a successful parental benefit exception claim rests not on whether the parent/child contacts '"confer some incidental benefit to the child[,]'" but on whether the person "occupied a parental role" in the child's life. (*In re Beatrice M., supra,* 29 Cal.App.4th at pp. 1418, 1419.) Here, at best Father established he had pleasant contacts with M.G. and L.G. but did not show they would be greatly harmed if the relationship was severed.

*In re Amber M., supra,* 103 Cal.App.4th 681, illustrates the compelling evidence necessary to establish the benefit exception. There, the court reversed termination of parental rights where a psychologist, therapists, and the court-appointed special advocate uniformly concluded "a beneficial parental relationship . . . clearly outweigh[ed] the benefit of adoption." (*Id.* at p. 690.) Additionally, two older children had a "strong primary bond" with their mother, and the younger child was "very strongly attached to her." (*Ibid.*) If the adoptions had proceeded, the children would have been adopted in separate groups. (*Id.* at pp. 690–691.)

Here, Father did not demonstrate harm would have ensued from termination of parental rights similar to that demonstrated in *Amber M.* At the permanency stage, the bond the child shares with the parent and the harm that might arise from terminating parental rights must be balanced against what is to be gained in a permanent stable home, and "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) The parental benefit exception will apply only where the parent has demonstrated the benefits to the child of continuing the parental relationship outweigh the benefits of permanence through adoption.

Given the history of this case, Father had a long way to go to establish that the children would benefit from continuing their relationship with him. M.G. and L.G. had serious educational and developmental deficits which were now being addressed by Mr. and Mrs. N. and the children were thriving. Father failed to recognize these problems in the past and his stated distrust of DCFS and his refusal to avail of their

services over the past five years does not lead us to believe he would take the appropriate action in the future.

Father emphasizes the quality of his visits with the children and that M.G. and L.G. would be sad if they could not see him again. Father's cordial visits with his children, *in a monitored setting,* give no insight into Father's ability to parent his children in a safe and appropriate manner. In fact, the children appeared to be in control during the visits and generally ignored Father's attempt to assert himself. Father never advanced beyond monitored visitation and it is difficult for him to show that the children would be greatly harmed by termination of his parental rights. (*In re Casey D., supra,* 70 Cal.App.4th at p. 51.)

Father points to nothing in the record indicating that any benefit M.G. and L.G. might gain by continuing their relationship with him outweighed "the well-being [M.G. and L.G.] would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Accordingly, we conclude the court did not abuse its discretion by concluding the parental benefit exception did not apply.

## DISPOSITION

The orders denying Mother and Father's section 388 petitions and terminating their parental rights are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, P. J.
BOREN

We concur:

_____, J.
ASHMANN-GERST

_____, J.
CHAVEZ

29